**ATLANTIC COAST LINE RAILROAD COMPANY and Seaboard Air Line Railroad Company, Plaintiffs,**

v.

**UNITED STATES of America, Defendant,**

and

**Interstate Commerce Commission and S. C. Loveland Company, Inc., Intervening Defendants.**

Civ. A. No. 4724-J.

United States District Court
S. D. Florida,
Jacksonville Division.

Jan. 18, 1962.

David E. Wells, Jacksonville, Fla., Wilkes C. Robinson, Richmond, Va., for

plaintiffs; P. C. Beverly, Albert B. Russ, Jr., Prime F. Osborn, Jacksonville, Fla., of counsel.

Lee Loevinger, Asst. Atty. Gen., Richard A. Solomon, U. S. Dept. of Justice Washington, D. C., Edward F. Boardman, U. S. Atty., Miami, Fla., for defendant United States of America.

Robert W. Ginnane, Gen. Counsel, James Y. Piper, Asst. Gen. Counsel, Interstate Commerce Commission, Washington, D. C., for intervening defendant Interstate Commerce Commission.

Donald Macleay, Harold Mesirow, Macleay, Lynch & Macdonald, Washington, D. C., for intervening defendant S. C. Loveland Co., Inc.; Knight, Kincaid, Poucher & Harris, Jacksonville, Fla., of counsel.

Before JONES, Circuit Judge, and SIMPSON and McRAE, District Judges.

McRAE, District Judge.

S. C. Loveland Company, Inc. (Loveland) operates under authorization of the Interstate Commerce Commission as a common carrier by water between various Atlantic seaboard ports from Maine to Key West. On December 23, 1958, Loveland applied to the Interstate Commerce Commission for a revised certificate of public convenience and necessity, authorizing an extension of its operating authority to Tampa, Florida, and intermediate points on the west coast of Florida. The Hearing Examiner rejected part of Loveland's application, but gave his approval to the extension of tug and barge service from Atlantic seaboard ports to Tampa.[1] Division I of the Commission approved the Hearing Ex-

aminer's order, and on June 15, 1961, the entire Commission in General Session denied motions for reopening and reconsideration. Commission Docket No. W-16 (Sub-No. 5).

Atlantic Coast Line Railroad Company (ACL) and Seaboard Air Line Railroad Company (SAL), who had been protestant parties during the Commission proceedings, thereafter, on July 7, 1961, instituted an action against the United States to set aside and permanently to enjoin enforcement of the Commission's ruling. 28 U.S.C. §§ 2284, 2321–2325. On the same date, they obtained an order from the district court temporarily restraining enforcement and operation of the Commission's ruling. The Interstate Commerce Commission and S. C. Loveland Company, Inc., were later allowed to intervene as defendants. The case was then brought on for hearing before this court.

The basic considerations declared by Congress as controlling in cases of this kind are enunciated in the Interstate Commerce Act. Preceding each Part of the Act is the general provision entitled "National Transportation Policy" which reads in part as follows:

"It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act \* \* \*, so administered as to recognize and preserve the inherent advantages of each; to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the sev-

---

1. Loveland's original application sought authority to operate
   "\* \* \* as a common carrier by self-propelled carrying vessels and non-self-propelled vessels with the use of separate towing vessels, in the transportation of commodities generally, and by towing vessels in the performance of general towage, to include service to Tampa, Florida, including intermediate ports and points."
   Report of Hearing Examiner, sh. 2, No. W–16 (Sub-No. 5).

Loveland also claimed that the right incidental to its existing certificate of operating on tributary waterways gave it authority to operate along the whole length of the inland waterway from the Florida east coast through Lake Okeechobee to Fort Myers on the Florida west coast. It was ruled, however, that the Okeechobee route could be "considered as tributary to the Atlantic coast only as far west as the Lake. \* \* \*" Id. at sh. 10.

eral carriers; * * *—all to the end of developing, coordinating, and preserving a national transportation system by water, highway, and rail, * * *." 49 U.S.C. Preamble to Chapters 1, 8, 12, 13, 49 U.S.C.A. note preceding sections 1, 8, 12, 13.

The statute specifically governing this case is Section 309(c) of the Act (49 U.S.C. § 909(c), 49 U.S.C.A. § 909(c)). In order for a certificate to issue, two basic requirements must be met. The Commission must find that:

(1) "the applicant is fit, willing, and able properly to perform the service proposed * * *."

and

(2) "the proposed service * * * is or will be required by the present or future public convenience and necessity;"

In the present case the only issue is public convenience and necessity. The fitness of Loveland to provide the proposed service is not questioned.

█ It is well established that judicial review of an order of the Commission is limited in scope. 5 U.S.C. § 1009 (e), 5 U.S.C.A. § 1009(e). Some appreciation as to the narrowness of this court's review may be found in Allen v. United States, 187 F.Supp. 625, 627 (S.D. Fla.1960):

" * * * The scope of the Court's authority on review is too basic to belabor. Consistently, it has been held that the orders of the Commission should not be set aside, modified or disturbed on review by a Court if such orders lie within the scope of the Commission's statutory authority, if they are based upon adequate findings, and if they are supported by substantial evidence. Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 54 S.Ct. 692, 78 L.Ed. 1260; Rochester Telephone Corp. v. United States, 307 U.S. 125, 59 S.Ct. 754, 83 L.Ed. 1147.

2. In paragraph 7 of their complaint the railroads make the statement that:
" * * * The gravamen of this complaint is that it was simply presumed

The courts are not concerned with the correctness of the Commission's reasoning or with the consistency or inconsistency of decisions which it has rendered. Virginian Railway Co. v. United States, 272 U.S. 658, 47 S.Ct. 222, 71 L.Ed. 463; Western Paper Makers' Chemical Co. v. United States, 271 U.S. 268, 46 S.Ct. 500, 70 L.Ed. 941. Nor is the review to determine how the public interest will best be served. This is a function of the Commission and is made such by the terms of the statute. United States v. Pierce Auto Freight Lines, Inc., 327 U.S. 515, 66 S.Ct. 687, 90 L.Ed. 821. * * * "

In terms of the statutory language, the railroads are contending that the order of the Commission in this case is "unsupported by substantial evidence". The question for decision, therefore, is whether or not there was substantial evidence before the Commission that present or future public convenience and necessity would be served by the grant to Loveland of a revised certificate.

█ The rail carriers' primary position seems to be that the shippers and manufacturers who appeared before the Commission in support of Loveland's application expressed no other reason for barge service to Tampa than a desire for rates lower than those charged by the land carriers. Consequently, the railroads conclude that the only ground of public convenience or necessity on which the Commission could have granted the Loveland application was lower rates. From this premise they argue that no evidence having been introduced with regard to Loveland's rates, the Commission must have presumed that Loveland could and would offer lower rates.[2] In short, the sum and substance of their contention is that Loveland did not introduce any evidence of comparative rates and therefore completely failed to discharge its burden of showing a public need for barge service.

by the Commission in this proceeding that applicant, S. C. Loveland Company, Inc. was the low-cost carrier."

In our opinion the theory of the rail carriers is misconceived. It is true that there was considerable testimony before the examiner as to the desires of shippers for lower rates, leading Division I to state that, "Collectively, the six supporting shippers express a need for low-cost transportation service". Division I Report, sh. 7. But aside from rates, the record is replete with other reasons for extending the authority of Loveland to Tampa.

More is involved in this case than a mere extension of tug and barge service. At present, there is a system of water carriers operating along the entire Atlantic coast, and there is another system operating along the Mississippi River and the Gulf of Mexico. The one gap that separates these two networks extends from Tampa to the Florida east coast. If the proposed extension is granted to Loveland, that gap might be effectively closed.

Among the witnesses supporting the application of Loveland were representatives of Gulf-Canal Lines, Inc., and Blue Stack Towing Company, water carriers operating between New Orleans and Tampa. Both of these witnesses testified in detail as to the feasibility of interline arrangements with Loveland at Tampa and stated that they anticipate entering into such arrangements with Loveland if its application is approved. (Tr. 184–208, 208–235). These witnesses further testified that an interline arrangement at Tampa would be the most feasible way to link up the Atlantic and Gulf coast systems (Tr. 186–188, 200–201, 209, 229–230). The testimony of the representative of Fillette-Green & Company of Tampa, steamship agents, was also to this effect (Tr. 288–295).

Against this background appeared several shippers who stated that for various reasons, other than the possibility of reduced rates, they support the extension proposed by Loveland. The traffic manager of a large steel sales company testified that barge shipment could be advantageous to his company in many ways (Tr. 15–60). As striking examples, he told of sales involving deliveries to off-shore construction projects and of lengths of steel too long for railroad cars but which could readily be delivered by barge (Tr. 22, 29–30, 45–49, 54, and 21, 31, 37, 43). The traffic manager of a paper manufacturer stated that barge service would frequently be advantageous to his company in making bulk shipments, especially because of efficiency in loading and unloading (Tr. 295–315). In the course of his testimony, he stated that even though rail rates are competitive with barge rates over certain routes, "I still use barge on some specific orders, because rate is not the only thing that determines whether a shipment will move by one mode of transportation or another". (Tr. 310).

The supervisor of traffic and storage for a phosphate company stated that barge service lent itself especially well to his company's bulk traffic needs (Tr. 262–269). Finally, the traffic supervisor for another phosphate company testified that the availability of barge service from his company's Tampa manufacturing plant to New England and Middle Atlantic customers would make possible the stabilization of shipping movements, reducing congestion during peak periods and eliminating the necessity for either accumulating substantial railroad demurrage charges or shutting down operations during slack periods (Tr. 235–250).

Division I of the Commission concluded after a review of the record that:

"In our opinion applicant has demonstrated a public need for the proposed service to the extent recommended by the examiner. We are aware that such a grant will not only open up barge-line service between Tampa, on the one hand, and, on the other, ports along the Atlantic Coast, but also will allow applicant by means of interline arrangements with other water common carriers to institute a similar service between ports along the Atlantic Coast on the one hand, and, on the other, ports in the Gulf area and along the Mississippi River. Neither of these services is now available to the shipping public. Six supporting shippers.

have shown a need for such water transportation service, and two water common carriers are willing to enter into interline arrangements with applicant for shipments to be interchanged at Tampa. Although the existing rail service is generally satisfactory, the evidence of record supports the conclusion that a large portion of shippers' traffic presently moving, and which will move in the future from and to the involved territory, has characteristics which make it inherently suited for transportation by barge. Because of these inherent advantages, this Commission has consistently found that the shipping public is entitled to the benefits of transportation by water, including the advantage of low rates if such be the case, even though rail and motor transportation services are available. [Cit. omitted]". (Div. I Rep., sh. 10).

Manifestly, there is substantial evidence in the record in support of this conclusion.

■ The railroads contend, on the basis of Schaffer Transportation Co. v. United States, 355 U.S. 83, 78 S.Ct. 173, 2 L.Ed.2d 117 (1957), that the Commission was required as a matter of law to inquire into the question of comparative rates. Perhaps the railroads intended to qualify their reliance on Schaffer on the assumption that the question of lower rates was the only ground of public convenience and necessity before the Commission. But the logical implication and seeming intent of their argument is that rates must necessarily be considered in all such Commission proceedings as the present one. In our opinion, Schaffer does not support this contention.

Schaffer involved an application filed by a motor carrier for an extension of its operating authority, so that it could compete for granite hauling contracts in an area previously served only by rail. The Commission expressly found that the existing railroad service was satisfactory and that shipper support for the motor carrier application was attributable solely to a desire for lower rates, rather than to a desire for improved service. Regarding rates as an improper issue in a certificate proceeding, the Commission accordingly denied the application.[3] On the facts presented, the Supreme Court held that in an inter-modal situation, comparative rates are a factor to be assessed where pertinent in ascertaining inherent advantages. The case was remanded to the Commission for reconsideration. In our opinion, the Supreme Court plainly did not make consideration of comparative rates mandatory for every case.

The broad reading of Schaffer seemingly asserted by the rail carriers in the present case has been rejected, either expressly or impliedly, on numerous occasions.[4] In fact, the Commission rejected that reading on its reconsideration of Schaffer, using language particularly appropriate to the present case:

"Though the Supreme Court noted that lower rates may also be a factor for consideration as an inherent advantage, the presence of other inherent advantages which are of sufficient weight to warrant a grant of

---

3. The Interstate Commerce Act makes special provisions for inquiring into the propriety or impropriety of rate levels. Section 307 of the Act (49 U.S.C. § 907, 49 U.S.C.A. § 907), for example, sets forth the procedure for examining water carrier rates. For that reason the Commission and the courts ordinarily refuse to consider rate questions in certificate proceedings, particularly when the opposing parties are competitors in the same mode of transportation. See American Trucking Ass'ns v. United States, 326 U.S. 77, 86–87, 65 S.Ct. 1499, 89 L.Ed. 2065 (1945); Railway Express Agency v. United States, 153 F.Supp. 738, 741 (S.D.N.Y.1957).

4. Yale Transport Corp. v. United States, 185 F.Supp. 96, 101 (S.D.N.Y.1960), aff'd 365 U.S. 566, 81 S.Ct. 754, 5 L.Ed. 2d 806; Commercial Transport, Inc. v. United States, 173 F.Supp. 524, 527–8 (E.D.Ill.1959), aff'd sub nom., Wabash Railroad Co. v. Commercial Transport, Inc., 361 U.S. 1, 80 S.Ct. 50, 4 L.Ed.2d 49; Great Northern Ry. Co. v. United States, 172 F.Supp. 705, 707 (Minn. 1959); Seatrain Lines, Inc. v. United States, 168 F.Supp. 819, 826 (S.D.N.Y.

authority as now sought, make it unnecessary to perfect the record as to whether applicant or the railroads now offer or have the ability to operate at the lower rate. There is nothing in the Court's decision which indicates any specific type or number of such advantages need be present in a given case, but rather where certain inherent advantages do exist, the Court indicated that we must consider 'whether on the balance the public interest would be better served by additional competitive service.'" In Schaffer Extension-Granite, 77 MCC 5, 9–1011958.

The railroads on the other hand have not cited, nor have we found, a single case endorsing their broad reading.

In view of the conclusions we have reached it is unnecessary to consider the remaining questions urged by the railroads.

The railroads' requests for relief are in all respects hereby

Denied.

1958); Stott v. United States, 166 F. Supp. 851, 856 (S.D.N.Y.1958); Bass v. United States, 163 F.Supp. 1, 3 (W.D. Va.1958), aff'd, 358 U.S. 333, 79 S.Ct. 351, 3 L.Ed.2d 350, reh. den. 359 U.S. 956, 79 S.Ct. 737, 3 L.Ed.2d 764; Breswick & Co. v. United States, 160 F.Supp. 754, 756 (S.D.N.Y.1958).