**AUCLAIR TRANSPORTATION, INC., et al., Plaintiffs,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Defendants.**

Civ. A. No. 62–927.

United States District Court
D. Massachusetts.

Sept. 6, 1963.

Kenneth B. Williams, Boston, Mass., Peter T. Beardsley and Richard R. Sigmon, Washington, D. C., for plaintiff.

W. Arthur Garrity, Jr., U. S. Atty., Boston, Mass., Lee Loevinger, Asst. Atty. Gen., John H. D. Wigger, Lionel Kestenbaum and Joel E. Hoffman, Washington, D. C., for defendant United States.

Robert W. Ginnane, Gen. Counsel, H. Neil Garson, Assoc. Gen. Counsel, Washington, D. C., for defendant Interstate Commerce Commission.

J. Joseph Maloney, Jr., Boston, Mass., William J. Taylor and William H. Marx, New York City, appeared for intervening defendant Railway Express Agency, Inc.

Before HARTIGAN, Circuit Judge, and GIGNOUX and CAFFREY, District Judges

CAFFREY, District Judge.

This is an action in which petitioners seek to set aside and enjoin a report and order of the Interstate Commerce Commission entered on October 5, 1962 granting intervenor-defendant Railway Express Agency, Inc. (REA) five certificates of public convenience and necessity authorizing REA to operate as a common carrier by motor-vehicle in interstate or foreign commerce of general commodities moving in express service over regular routes between designated points in several of the New England States subject to specified conditions. Jurisdiction of this Court is invoked under 49 U.S.

C.A. § 305(g), 5 U.S.C.A. § 1009, and 28 U.S.C.A. §§ 1336, 1398, 2284, and 2321 to 2325.

The facts giving rise to this case are set out on pages 2 through 5 of this opinion and are taken from pages 3 through 6 of Brief of Plaintiffs.

## STATEMENT OF THE CASE

By a series of five applications filed under Section 206 of the Interstate Commerce Act, 49 U.S.C. § 306, Railway Express, a Delaware corporation organized by the principal railroads of the country in 1928, and the capital stock of which is wholly owned by such railroads, sought authority from the Commission to engage in transportation in interstate and foreign commerce as a common carrier by motor vehicle of general commodities, including class A and B explosives, moving in express service, over designated regular routes, as follows:

Sub-No. 1515—(1) between Boston, Mass., and Manchester, N. H., serving the intermediate points of Nashua, N. H., and (2) between Boston, Mass. and Dover, N. H., serving the off-route points of Newburyport, Mass., and Hampton, N. H., and the intermediate point of Portsmouth, N. H.;

Sub-No. 1577—(1) between White River Junction, Vt. and Whitefield, N. H., serving the intermediate points of Fairlee and Bradford, Vt., and Woodsville and Littleton, N. H., and (2) between Wells River and Newport, Vt., serving the intermediate points of St. Johnsbury, Barton, and Orleans, Vt.;

Sub-No. 1594—between Manchester, N. H., and White River Junction, Vt., serving the intermediate points of Concord, Potter Place and Lebanon, N. H.;

Sub-No. 1595—between Boston, Mass. and Portland, Maine, serving no intermediate points; and

Sub-No. 1687—between Hoosick Falls, N. Y., and Middlebury, Vt. serving the intermediate points of

North Bennington, Arlington, Manchester, Danby, Rutland, Proctor, Brandon, Ludlow, and Chester, Vt.

Separate hearings were held on these applications at various times between November 5, 1959 and February 16, 1961, at which the various motor carrier plaintiffs whose interests were affected appeared in protest and presented evidence. Each of the applications was the subject of a report and recommended order by a Joint Board or Hearing Examiner, and exceptions were duly taken by various plaintiffs.

American Trucking Associations, Inc., the plaintiff association, was permitted to intervene in these proceedings at various stages.

Three of the applications (Sub-Nos. 1577, 1594 and 1595) were disposed of by a single report and order by Division I of the Commission. Plaintiffs who were protestants in those proceedings petitioned for reconsideration and, by order dated November 20, 1961, the Commission reopened those proceedings on its own motion and assigned all five proceedings for oral argument. Consolidated oral argument on the five proceedings was had before the full Commission on January 16, 1962. On October 24, 1962, the Commission served its report and order dated October 5, 1962 (Complaint, Appendix A) complained of herein.

In substance, the report and order authorizes REA to operate in interstate or foreign commerce as a common carrier by motor vehicle of general commodities moving in express service between the points and over the routes requested in the applications, subject to certain conditions. The authority granted in MC–66562 (Sub-Nos. 1515, 1577, 1594 and 1595) was made subject to conditions numbered 1–4 below, and the authority granted in MC–66562 (Sub-No. 1687) was made subject to conditions 1, 3, 4 and 5 below.

1. The service to be performed by applicant shall be limited to that which is auxiliary to or supple-

mental of express service of the Railway Express Agency.

2. Shipments transported by applicant shall be limited to those moving on through bills of lading or express receipts.

3. The authority granted herein, to the extent it authorizes the transportation of dangerous explosives, shall be limited, in point of time, to a period expiring 5 years from the date of the certificate.

4. Such further specific conditions as the Commission, in the future, may find necessary to impose in order to restrict applicant's operations to a service which is auxiliary to or supplemental of express service of the Railway Express Agency.

5. Shipments transported by applicant shall be limited to those moving on through bills of lading or express receipts covering, in addition to a motor-carrier movement by applicant, an immediately prior or an immediately subsequent movement in express service of the Railway Express Agency.

Aside from, but basic to, the question of the existence of a public need for the proposed services, the issues before the Commission concerned "the broader legal and policy questions surrounding" Railway Express's operations. The basic positions of the parties was well summarized by the Commission:

In these respects it is the basic position of protestants and ATA that REA is embarked upon a program of converting its operations from those in the nature of true express service performed principally in connection with rail or air service, to those in the nature of nationwide general freight operations by motor vehicle unrelated to the rail operations of REA's sponsors, in competition with, and to the detriment of, existing common carriers of general freight;

and that in pursuing and fulfilling this goal REA, because it is wholly owned by railroads, is in contravention of the National Transportation Policy and the policy of Section 5(2)(b) of the act against wholesale incursions by rail affiliates into the motor carrier field. REA's position is, in essence, that it simply seeks here to provide the same services by motor vehicle exclusively that it formerly was able to make available in connection with the use of passenger train service; and that the proposed services, to be operated without any prior or subsequent movement by rail, but with other rail-connected restrictions, in the circumstances here shown would not be an unwarranted or excessive separation from the essential nature of its overall operations as an express company. The underlying theme of REA's position appears to be that it has always provided, and here seeks to continue, the unique service of an express company which common carriers of general freight in almost every instance cannot provide equally well; and that the public, which has relied traditionally upon REA for the handling of both localized and nationwide express movements, should not be deprived thereof only because of the curtailment or discontinuance of rail passenger service which REA had been able to utilize formerly in the performance of such service.

Before this Court plaintiffs urged that the Commission erred in finding that the present and future public convenience and necessity required the operations proposed by REA in the applications involved; that the Commission erred in granting the certificates without attaching thereto conditions limiting the transportation thereunder to shipments having a prior or subsequent movement by rail or air (the so-called rail-haul restriction); that the Commission erred in concluding that the condition requiring a prior or subsequent movement by rail or air in *outstanding* REA certificates

only requires that traffic moved thereunder be not transported in a wholly motor movement; and that the Commission's interpretation of the "rail-haul" restriction modified the outstanding motor carrier certificates of REA in violation of 49 U.S.C. §§ 306, 307.

## I. THE ORDER OF THE COMMISSION IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND IS IN ACCORD WITH THE MANDATE OF THE INTERSTATE COMMERCE ACT.

■ The Interstate Commerce Commission has been charged by Congress with the obligation to decide whether and when additional motor carrier service would serve "the present or future public convenience and necessity," Interstate Commerce Act, § 207(a), 49 U.S.C. § 307(a). In the performance of that obligation the Commission has been entrusted with a wide range of discretionary authority, Interstate Commerce Commission v. Parker, 326 U.S. 60, 65, 65 S.Ct. 1490, 89 L.Ed. 2051 (1945). Each case "entails not only a weighing of evidence by the Commission but also the exercise by it of an expert judgment on the intricacies of the transportation problems involved." A. B. & C. Motor Transportation Co. v. United States, 151 F.Supp. 367, 371 (D.Mass.1956).

The Commission's report in the instant case defined "express service" to mean

"generally the expedited handling of small parcel traffic which common carriers of ordinary freight do not desire usually or are not able to perform. It is a service superior to that rendered as a rule by common carriers of general freight, and thus requires the payment of premium charges."

and went on to observe:

"From this view it follows that express service is not susceptible of precise definition because it is, by its very nature, a service whose attributes of expediency, premium rates and special handling of freight must

be judged in comparison with the services and rates provided and assessed usually by common carriers of ordinary freight." Railway Express Agency, Inc. Extension-Nashua, N. H., 91 M.C.C. 311, 324 (1962).

At oral argument the plaintiff motor carriers indicated that their quarrel was not with this definition, which has long been well-recognized in the transportation industry, see Transportation Activities of Arrowhead Freight Lines, 63 M.C.C. 573 (1955), but with the Commission's finding that the evidence showed a public need for such service. This argument was made in the face of voluminous evidence that there is such a need. Plaintiffs do not dispute the finding of Division 1 adopted by the Commission that the service proposed by REA is a continuation of service which it previously had rendered utilizing now-discontinued rail passenger trains; e. g., Railway Express Agency, Inc. Extension-Newport, Vt., 84 M.C.C. 435, 441 (1961) adopted 91 M.C.C. 311, at 315 and 342 (1962). Plaintiffs also agree that the evidence reveals a substantial amount of express traffic is presently moving (under temporary motor-carrier authority granted to REA) from and to points on the routes involved. 84 M.C.C. at 441, 91 M.C.C. at 341. Moreover, the record contains extensive testimony of shippers relative to their need for an express service like that proposed to be continued by REA, to which the Commission also adverted. 91 M.C.C. at 316, 318, 341; 84 M.C.C. at 438–439, 441, adopted 91 M.C.C. at 342. An example of the type of transportation service which the shippers desired is illustrated by the Commission's findings with respect to the application in No. 1515. The Commission states at p. 316:

"The application is supported by 14 shippers, 11 of whom are located at or near proposed service points along the routes involved, and 3 of whom are located at the communities of Hooksett and Somersworth, N. H., and South Berwick, Maine, which points are conceded by REA not to

be within the commercial zones of any of the involved service points. This distinction aside for the moment, the 14 shippers collectively receive and ship from and to various points in the United States and those in other countries articles such as electronic equipment, shellfish, garments, silverware, office equipment, advertising material, eggs, baby chicks, and art work. The shellfish and eggs are of a perishable nature and require special care when transported, and the silverware and some of the electronic equipment and related parts require armed surveillance. All of the shippers have used applicant's service for the expeditious and special handling provided, which they desire to have available permanently; and a few use additionally the services of motor common carriers, principally for their large volume shipments, and parcel post and air express for other small shipments."

Similar evidence was adduced in the other four applications; see, e. g., findings of Division 1, 84 M.C.C. at pp. 438, 439. The Commission relied on this testimony (specifically excluding from consideration the testimony of the three shippers not located at the involved service points, 91 M.C.C. at 341) plus exhibits introduced into the record which showed the type and amount of express traffic moving over the routes involved, in reaching its conclusion as to the need for the grant of the certificates.

Turning to the service being rendered by plaintiffs the Commission found that it fails to meet the existing need. Plaintiffs concede that their certificates do not permit them to transport commodities of unusual value, and do not challenge the finding that they have to date shown no willingness to perform express service of any kind. 91 M.C.C. at 341. Their argument that they should be given "a reasonable opportunity to meet the need" (Brief for Plaintiffs, p. 52), was answered by the Supreme Court in United States v. Detroit & Cleveland Navigation Co., 326 U.S. 236, 241, 66 S.Ct. 75, 77, 90 L.Ed. 38 (1945), wherein Mr. Justice Douglas said:

"(The Commission's) doubt that the public interest will be adequately served if resumption of service is left to existing carriers is entitled to the same respect as its expert judgment on other complicated transportation problems. * * * Forecasts as to the future are necessary to the decision. But neither uncertainties as to the future nor the inability or failure of existing carriers to show the sufficiency of their plans to meet future traffic demands need paralyze the Commission into inaction. It may be that the public interest requires that future shipping needs be assured rather than left uncertain. The Commission has the discretion so to decide. It went no further here."

■■ Even assuming *arguendo* that the plaintiffs are presently able to provide the unique express service required by shippers, this factor alone would not bar the Commission from certifying additional service. Norfolk Southern Bus Corp. v. United States, 96 F.Supp. 756, 761 (E.D.Va.1950), aff'd. per curiam 340 U.S. 802, 71 S.Ct. 68, 95 L.Ed. 590 (1950). Plaintiffs have no vested right to be immunized against competition. A. B. & C. Motor Transp. Co. v. United States, 69 F.Supp. 166, 169 (D.Mass.1946).

■ Finally, it is urged that the Commission erred in failing to consider whether REA's rates were in fact premium rates before granting the certificate. In this instance the Commission followed a long-settled and judicially approved procedure in holding that the proper place to test the legality of REA's rates was in a complaint proceeding under 49 U.S.C. § 316(e), and not in a certificate proceeding. See American Trucking Ass'ns v. United States, 326 U.S. 77, 86–87, 65 S.Ct. 1499, 89 L.Ed. 2065 (1945); Railway Express Agency, Inc. v. United States, 153 F.Supp. 738, 741 (S.D.N.Y.1957), aff'd. per curiam 355 U.S. 270, 78 S.Ct. 330, 2 L.Ed.2d 257

(1957). The Commission's decision not to depart from this procedure was entirely a matter within its discretion. Cf. Securities and Exchange Commission v. Chenery Corp., 332 U.S. 194, 202, 203, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947).

■ Plaintiffs have failed to show that the Commission's findings are insufficient as a matter of law to support its discretionary judgment that the public convenience and necessity require the issuance of the certificates which REA was granted. Nor have they shown that the findings are unsupported by substantial evidence.

II. THE COMMISSION WAS NOT REQUIRED TO INCLUDE IN THE CERTIFICATES GRANTED TO REA A RESTRICTION LIMITING TRANSPORTATION THEREUNDER TO SHIPMENTS HAVING A PRIOR OR SUBSEQUENT MOVEMENT BY RAIL OR AIR.

■ The plaintiffs next contend that the Commission's grant of certificates of public convenience and necessity to REA without attaching conditions limiting transportation thereunder to shipments having a prior or subsequent movement by rail or air violates the Congressional "policy of opposition to railroad incursions into the field of motor carrier service (which) has become firmly entrenched as a part of our transportation law." American Trucking Ass'ns, Inc. v. United States, 364 U.S. 1, 7, 80 S.Ct. 1570, 1574, 4 L.Ed.2d 1527 (1960). This policy is based upon the National Transportation Policy, 54 Stat. 899, 49 U.S.C. preceding sec. 1, which declares that the Interstate Commerce Act is to be "so administered as to recognize and preserve the inherent advantages of each (mode of transportation);" and is also based on Sec. 5(2) (b) of the Interstate Commerce Act, 49 U.S.C. § 5(2) (b), which enjoins the Commission to withhold approval of an acquisition by a "carrier by railroad * * * or any person which is controlled by such a carrier, or affiliated therewith"

of a motor carrier "unless it finds that the transaction proposed will be consistent with the public interest and will enable such (railroad) carrier to use service by motor vehicles to public advantage in its operations and will not unduly restrain competition." (REA concedes that it is affiliated with the railroads within the meaning of Section 5(2) (b).) The Commission long ago conclude that this policy required that the standards of Section 5(2) (b) be applied in proceedings for certificates of convenience and necessity under Sec. 207. Kansas City Southern Transport Co. Common Carrier Application, 10 M.C.C. 221 (1938). Over the years the Commission has given effect to this policy by imposing certain restrictions in certificates granted to rail-affiliated motor carriers, as, for example, the condition limiting the applicant to the transportation of shipments having an immediately prior or immediately subsequent movement by rail (the so-called "rail-haul" restriction). This interpretation by the Commission of its statutory duty was expressly approved by the Supreme Court in United States v. Rock Island Motor Transit Co., 340 U.S. 419, 71 S.Ct. 382, 95 L.Ed. 391 (1951). Plaintiffs complain that the Commission erred in granting certificates to REA in the instant applications without including a "rail-haul" restriction. This contention is without merit. The Commission has often found in the past that the public convenience and necessity would be served by granting certificates to REA which omitted the rail-haul restriction. See, e. g., Railway Express Agency, Inc., Extension of Operations—Williamsport—Elmira, 26 M.C.C. 747 (1940), Railway Express Agency, Inc., Extension of Operations—Newport, R. I., 31 M.C.C. 689 (1942), Railway Express Agency, Inc., Extension of Operations—Washington—Harrisonburg, 33 M.C.C. 671 (1952). The Supreme Court, in approving the Commission's use of "the policy of § 5(2) (b) as a guiding light, not as a rigid limitation" in interpreting Section 207, has held expressly that the Commission had discretion to

grant totally unrestricted operating authority to rail-affiliated companies

> "where 'special circumstances' prevail, namely, where unrestricted operations by the rail-owned carrier are found on specific facts and circumstances to be in the public interest. (citing cases),"

and has concluded that

> " * * * the underlying policy of § 5(2) (b) must not be divorced from proceedings for new certificates under § 207. Indeed, the Commission must take 'cognizance' of the National Transportation Policy and apply the Act 'as a whole.' But, for reasons we have stated, we do not believe that the Commission acts beyond its statutory authority when in the public interest it occasionally departs from the (restriction that proposed services be auxiliary and supplemental to train service in a certificate granted) in a § 207 proceeding."

American Trucking Ass'ns v. United States, 355 U.S. 141, 149–152, 78 S.Ct. 165, 2 L.Ed.2d 158 (1957).

In American Trucking Ass'ns, Inc. v. United States, 364 U.S. 1 at page 11, 80 S.Ct. 1570 at page 1576, 4 L.Ed.2d 1527 (1960), the Court quoted with approval the last paragraph set forth above, but held that the Commission had failed to find "special circumstances" sufficient to permit the granting of a certificate which did not contain the restriction there in question. In explaining the type of "special circumstances" required, the Court said:

> "There is, for example, no finding that independent contract carriers were unable or unwilling to perform the same type of service as (applicant)." 364 U.S. 1, 14, 15, 80 S.Ct. 1570, 1578.

In this proceeding the Commission has in fact found the necessary special circumstances. The Commission's report takes note of the interpretation placed on the statutes by both itself and the Court and finds specifically (upon substantial evidence) that existing motor carriers are in fact unable or unwilling to perform the type of service rendered by REA. 91 M.C.C. at 340.

The American Trucking cases make clear that the Commission acted well within its authority in granting the certificates in this case without a "railhaul" restriction. Indeed, such a restriction would have resulted in a denial of express service to shippers in the localities here under consideration, since the very reason for the applications was the discontinuance of passenger trains carrying express freight to these communities.

Nor is the Commission's order in this case incompatible with the Congressional desire "to recognize and preserve the inherent advantages of each (mode of transportation)." National Transportation Policy, 49 U.S.C. preceding Sec. 1. The Commission has long recognized the "historical cleavage" between ordinary freight service and express service and that

> "(Express) service may be said to be competitive with ordinary freight service to a very limited extent only, and the mere fact that it can and does survive in competition with general freight service conducted generally at lower rates is indicative of the inherent difference between the two services."

Railway Express Agency, Inc., Extension—Durant—Kosciusko, 34 M.C.C. 111, 114 (1942). Moreover, the Commission has expressly stated its willingness to look anew at any situation where common carriers show a willingness to compete in transportation of express traffic with REA to determine whether REA's motor vehicle operations work to "the undue detriment of common carriers of general freight." 91 M.C.C. at 340. Restriction No. 4, supra, gives the Commission "continuing jurisdiction to make certain that the * * * certificate issued here does not operate to defeat the National Transportation Policy." American Trucking Ass'ns v. United States, supra, 355 U.S. at 154, 78 S.Ct. at 172.

**336**

The remaining contentions in plaintiffs' brief do not find support in the record or in the case law sufficient to justify analysis or discussion thereof.

Complaint dismissed.