## AMERICAN TRUCKING ASSOCIATIONS, INC., ET AL. *v.* UNITED STATES ET AL.

No. 74. Argued May 19, 1960.—Decided June 27, 1960.

*Peter T. Beardsley* argued the cause for appellants. With him on the brief was *Larry A. Esckilsen.*

*Richard A. Solomon* argued the cause for the United States. With him on the brief were *Solicitor General Rankin* and *Acting Assistant Attorney General Bicks.*

*Robert W. Ginnane* argued the cause and filed a brief for the Interstate Commerce Commission, appellee.

*Robert L. Pierce* argued the cause for Pacific Motor Trucking Co. et al., appellees. With him on the brief were *Edward M. Reidy, Thormund A. Miller, Wm. Meinhold, Henry M. Hogan, Walter R. Frizzell* and *Beverley S. Simms.*

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

The principal question presented on this appeal is whether the appellee Interstate Commerce Commission properly declined to impose certain restrictions upon motor carrier permits it issued to a trucking company which is a subsidiary of a railroad.

The permits in question are designed to allow appellee Pacific Motor Trucking Company, a wholly owned subsidiary of Southern Pacific Company, to perform a particular type of transportation service for appellee General Motors Corporation. Prior to issuance of these permits, Pacific Motor already had been authorized to conduct certain trucking activities in a number of States into which Southern Pacific's extensive railway system penetrates. Without adverting to immaterial details, that authority may be described as follows: Pacific Motor held common carrier certificates from the Commission for the transportation of commodities, by way of service auxiliary to and supplemental of Southern Pacific rail service, over routes paralleling Southern Pacific lines in Oregon, California, Nevada, Arizona, New Mexico, and Texas. It also held contract carrier authority from the State of California for intrastate transportation of trucks and automobiles. Finally, it had been granted contract carrier permits by the Commission for the transportation of automobiles, trucks, and buses from certain points in California to three nonrail points in Nevada, to two points on the Mexican border, to certain points in Los Angeles

Harbor, and to points in Nevada located on the Southern Pacific line. These latter contract carrier permits did not contain restrictions designed to make the service auxiliary to and supplemental of Southern Pacific rail service. Pacific Motor's only contract carrier shipper has been General Motors.

By the four applications which gave rise to the present controversy, Pacific Motor sought to extend the scope of its contract carrier service for General Motors.. It requested authorization from the Commission for the transportation of new automotive equipment from plants of General Motors at Oakland, Raymer, and South Gate, California, to various interstate destinations not included within its prior permits. Generally speaking, the first application, designated *Sub 34,* covered contract carrier service from the Oakland plants to points on the Southern Pacific line in Oregon; the second, *Sub 35,* covered similar service to three Nevada nonrail points; the third, *Sub 36,* covered transportation from the Raymer plant to points in Arizona which are stations on the Southern Pacific line; and the last—and broadest—application, *Sub 37,* covered transportation from the Oakland, Raymer, and South Gate plants to points in seven States, whether or not on the Southern Pacific line.[1]

The Commission proceedings resulted in the grant of some, but not all, of the requested authority. On May 8, 1957, the Commission acted favorably on the *Sub 34* application. 71 M. C. C. 561. However, the Commission thereafter consolidated the four applications and heard oral argument. On September 9, 1958, the Commission issued its final report, 77 M. C. C. 605, which may

---

[1] With respect to the transportation from Oakland and Raymer, the States were Washington, Oregon, Idaho, Nevada, Utah, Arizona, and New Mexico. The proposed transportation from South Gate was to be to the same States, excluding New Mexico but adding Montana.

be described specifically enough for our purposes as authorizing transportation by Pacific Motor to the three additional Nevada nonrail points and to points on the Southern Pacific line in Nevada, Utah, Arizona, Oregon, and New Mexico.[2] Otherwise, the applications were denied. There were certain other conditions imposed by the Commission, which we will detail later, but the major restriction was the limitation of points of destination to points on the Southern Pacific line.

Appellants—American Trucking Associations, Inc., its Contract Carrier Conference, the National Automobile Transporters Association, and six motor carriers—brought suit in Federal District Court to set aside the Commission's order. See 28 U. S. C. § 1336. Appellees Pacific Motor and General Motors intervened in support of the order. The United States was named a party defendant, together with the Interstate Commerce Commission, but did not either participate in or oppose the defense. See 28 U. S. C. § 2323. A three-judge court, which was convened pursuant to 28 U. S. C. §§ 2325 and 2284, denied relief. 170 F. Supp. 38. Our appellate jurisdiction was invoked under 28 U. S. C. § 1253, and we noted probable jurisdiction. 361 U. S. 806. In this Court, the Commission opposes and the United States supports the appellants.

There is a preliminary, challenge by Pacific Motor and General Motors to appellants' standing, a challenge which was sustained by two members of the lower court. We disagree with this holding. Since the basis for our view on the problem of standing will be more readily appreciated after the merits of the case have been fully treated, we postpone our discussion of this matter.

---

[2] One Commissioner who concurred said that he would give broader authority; three Commissioners dissented from the grant; and of the three Commissioners who did not participate, one said that he would have joined the dissenters.

The critical issue raised by appellants is whether the Commission exceeded its statutory authority by granting the permits in question to a railroad subsidiary without imposing more stringent limitations than it did. On this question, the lower court unanimously ruled against appellants. This judgment must be evaluated in the light of this Court's previous decisions, set against the background of Commission practice.

Both the Commission and this Court have recognized that Congress has expressed a strong general policy against railroad invasion of the motor carrier field. This policy is evinced in a general way in the preamble to the 1940 amendments to the Interstate Commerce Act—the National Transportation Policy, 54 Stat. 899—which articulates the congressional purpose that the Act be "so administered as to recognize and preserve the inherent advantages" of "all modes of transportation." More particularly, Congress' attitude is reflected by a proviso to § 5 (2)(b) of the Act,[3] which enjoins the Commission to withhold approval of an acquisition by a railroad of a motor carrier "unless it finds that the transaction proposed will be consistent with the public interest and will enable such carrier to use service by motor vehicle to public advantage in its operations and will not unduly restrain competition."

The Commission long ago concluded that the policy of the transportation legislation requires that the standards of § 5 (2)(b)—then § 213 (a) of the Motor Carrier Act of 1935, 49 Stat. 555—be followed as a general rule in other situations, notably in applications for common carrier certificates of convenience and necessity under § 207.[4] *Kansas City Southern Transport Co., Common Carrier Application,* 10 M. C. C. 221 (1938). And this

---

[3] 54 Stat. 906, as amended, 49 U. S. C. § 5 (2)(b).

[4] 49 Stat. 551, 49 U. S. C. § 307.

Court has confirmed the correctness of the Commission's conception of its responsibilities under both § 5 (2)(b) and § 207. See *United States* v. *Rock Island Motor Transit Co.*, 340 U. S. 419; *United States* v. *Texas & Pacific Motor Transport Co.*, 340 U. S. 450; *Interstate Commerce Comm'n* v. *Parker*, 326 U. S. 60. The Court has also taken cognizance of the congressional confirmation of the Commission's policy by the 1940 re-enactment in § 5 (2)(b) of the provisions of § 213 (a), after some of the pertinent Commission decisions had been specifically called to Congress' attention. See *United States* v. *Rock Island Motor Transit Co.*, *supra*, at 432. And although the instant proceeding involves contract carrier applications and hence falls under § 209,[5] the Commission in its opinion recognized that, for purposes of the relevance of the § 5 (2)(b) standards, there is no distinction between this type of case and proceedings arising under § 207. 77 M. C. C. 621–622. Nor can we discern any grounds for differentiation.

Thus it is evident that the policy of opposition to railroad incursions into the field of motor carrier service has become firmly entrenched as a part of our transportation law. Moreover, this general policy fortunately has not been implemented merely by way of a more or less unguided suspicion of railroad subsidiaries, but rather has evolved through a series of Commission decisions from embryonic form into a set of reasonably firm, concrete standards.[6] The Commission's opinion in the case at bar describes these standards as follows:

> "The restrictions usually imposed in common-carrier certificates issued to rail carriers or their affiliates

---

[5] 49 Stat. 552, as amended, 49 U. S. C. § 309.

[6] The first major Commission decision was rendered the year after enactment of the Motor Carrier Act of 1935. *Pennsylvania Truck Lines, Inc., Acquisition of Control of Barker Motor Freight, Inc.*,

8

in order to insure that the service rendered there-under shall be no more than that which is auxiliary to or supplemental of train service are: (1) the service by motor vehicle to be performed by rail carrier or by a rail-controlled motor subsidiary should be limited to service which is auxiliary to or supplemental of rail service, (2) applicant shall not serve any point not a station on the railroad, (3) a keypoint requirement or a requirement that shipments transported by motor shall be limited to those which it receives from or delivers to the railroad under a through bill of lading at rail rates covering, in addition to the movement by applicant, a prior or subsequent movement by rail, (4) all contracts between the rail carrier and the motor carrier shall be reported to the Commission and shall be subject to revision if and as the Commission finds it to be necessary in

---

1 M. C. C. 101. In refusing approval of an acquisition unless certain conditions were met, a division of the Commission stated:

". . . [W]e are not convinced that the way to maintain for the future healthful competition between rail and truck service is to give the railroads free opportunity to go into the kind of truck service which is strictly competitive with, rather than auxiliary to, their rail operations. The language of section 213 . . . is evidence that Congress was not convinced that this should be done. Truck service would not, in our judgment, have developed to the extraordinary extent to which it has developed if it had been under railroad control. Improvement in the particular service now furnished by the partnership might flow from control by the railroad, but the question involved is broader than that and concerns the future of truck service generally. The financial and soliciting resources of the railroads could easily be so used in this field that the development of independent service would be greatly hampered and restricted, and with ultimate disadvantage to the public." *Id.*, at 111–112.

The development of Commission policy is traced in detail in *Rock Island Motor Transit Co.—Purchase—White Line Motor Freight Co.*, 40 M. C. C. 457. See also the similar and lengthy discussion in *United States* v. *Rock Island Co., supra, passim.*

order that such arrangements shall be fair and equitable to the parties, and (5) such further specific conditions as the Commission, in the future, may find it necessary to impose in order to insure that the service shall be auxiliary to, or supplemental of, train service. . . ."

The key phrase in this summary is obviously "auxiliary to or supplemental of train service." If a trucking service can fairly be so characterized, it is clear enough that there is compliance with the mandate of § 5 (2)(b) that the carrier should be able "to use service by motor vehicle to public advantage *in its operations.*" But if, on the other hand, the motor transportation is essentially unrelated to rail service, the railroad parent is invading the field of trucking, and, under normal circumstances, the National Transportation Policy is thereby offended.

It is this "auxiliary to or supplemental of" verbalization of the policy of § 5 (2)(b), as applied to § 207, that has found favor in this Court. See *American Trucking Assns.* v. *United States,* 355 U. S. 141; *United States* v. *Rock Island Motor Transit Co., supra; United States* v. *Texas & Pacific Motor Transport Co., supra; Interstate Commerce Comm'n* v. *Parker, supra.* Moreover, while the Court has not specified the more particularized restrictions which it might regard as essential constituents of the "auxiliary to or supplemental of" concept, it is significant that the Court in *Rock Island* apparently accepted the Commission's view that the phrase implies a limitation of function, *i. e.,* type of trucking service, and not merely a geographical limitation, *i. e.,* place where the service is performed.[7]   340 U. S., at 436–444.

---

[7] "The Commission asserts that the meaning of 'auxiliary and supplemental' . . . was not geographical. . . .

.     .     .     .     .

"What was in the Commission's mind as to the meaning of auxiliary and supplemental at the time it issued its certificate, we cannot be

But while the judicial and administrative current has run strongly in favor of auxiliary and supplemental restrictions on motor carrier subsidiaries of railroads, the Commission has determined, and this Court has agreed,

sure. At present a motor service is auxiliary and supplemental to rail service, in the Commission's view, when the railroad-affiliated motor carrier in a subordinate capacity aids the railroad in its rail operations by enabling the railroad to give better service or operate more cheaply rather than independently competing with other motor carriers. . . . The Commission has continually evidenced . . . its intention to have rail-owned motor carriers serve in auxiliary and supplemental capacity to the railroads.

.          .          .          .          .

"The Commission has expressed its policy . . . by the phrase, perhaps too summary, auxiliary and supplemental. Though the phrase is difficult to define precisely, its general content is set out in *Texas & Pacific Motor Transport Co. Application,* 41 M. C. C. 721, 726 [establishing generally the same conditions set forth in the text, *supra,* pp. 7–9] . . . . While the practice of the Commission has varied in the conditions imposed, the purpose to have rail-connected motor carriers act in coordination with train service has not. . . ." 340 U. S., at 439, 442–443.

See the detailed discussion in *Rock Island Motor Transit Co.—Purchase—White Line Motor Freight Co.,* 40 M. C. C. 457. ("[T]here . . . appears to have developed a tendency in rail-motor acquisition proceedings to treat the *Barker* case restrictions as geographical or territorial only in their intent rather than as substantive limitations upon the character of the *service* which might be rendered by a railroad or its affiliate under any acquired right." *Id.,* at 470.) See also *Texas & Pacific Motor Transport Co. Common Carrier Application, supra,* at 726. ("Since petitioner's certificates limit the service to be performed to that which is auxiliary to or supplemental of the rail service of the railway, it is without authority to engage in operations unconnected with the rail service . . . . To the extent petitioner is performing or participating in all-motor movements on the bills of lading of a motor carrier and at all-motor rates, it is performing a motor service in competition with the rail service and the service of existing motor carriers; and, to the extent it is substituting rail service for motor-vehicle service, the rail service is auxiliary to or supplemental of the motor-vehicle service rather than the motor-vehicle service being auxiliary to or supplemental of rail service.")

that the public interest may sometimes be promoted by not imposing such limitations. A prime example is *American Trucking Assns.* v. *United States, supra,* where the trucking service was not being performed adequately by independent motor concerns. We there observed that the mandatory provisions of § 5 (2)(b) do not appear in § 207, and approved the Commission's policy of not attaching auxiliary and supplemental restrictions where "special circumstances" prevail. We concluded:

> "We repeat . . . that the underlying policy of § 5 (2)(b) must not be divorced from proceedings for new certificates under § 207. Indeed, the Commission must take 'cognizance' of the National Transportation Policy and apply the Act 'as a whole.' But . . . we do not believe that the Commission acts beyond its statutory authority when in the public interest it occasionally departs from the auxiliary and supplementary limitations in a § 207 proceeding." 355 U. S., at 151–152.

These, then, are the guiding principles which have been established by what has gone before and which mark the range of our inquiry in this case. Since, as we have indicated, the Commission believes, and we agree, that there is no relevant difference between a § 207 proceeding and a § 209 proceeding so far as the problem here involved is concerned, the decisive questions are: (1) Did the Commission impose conditions upon the permits issued to Pacific Motor under which the service to be rendered would be truly auxiliary to and supplemental of Southern Pacific's rail service? (2) If not, was the Commission's waiver of such restrictions justified by "special circumstances"?

The first question need not detain us long. The principal permits were qualified only by the following conditions: (1) the service was to be restricted to points which

are stations on the Southern Pacific line; (2) "there may from time to time in the future be attached to the permits . . . such reasonable terms, conditions, and limitations as the public interest and national transportation policy may require"; and (3) Pacific Motor was to request the imposition of restrictions upon its outstanding certificates with respect to the transportation of automobiles and trucks.

The last restriction was designed to obviate any dual operation problem under § 210,[8] and is not pertinent to the auxiliary and supplemental standard. See 77 M. C. C., at 624. The second condition obviously is no restriction at all on present operations, and hence can hardly be said to limit the trucking to an auxiliary or supplemental service. We so recognized in *American Trucking Associations,* where the certificates contained a similar restriction. 355 U. S., at 154. And the first limitation, upon which appellees principally rely, is but a geographical, not a functional, restriction. As we have noted, *Rock Island* gives strong support to the view there expressed by the Commission that the essence of auxiliary and supplemental limitation is functional control. While it may be true, as appellees argue, that such a geographical limitation is a necessary ingredient of an auxiliary and supplemental restriction, it does not by any means follow that this ingredient makes the whole. Moreover, we have the strongest evidence that the Commission did not believe that it did, since the Commission specifically refrained from imposing the most general, but obviously the most significant, restriction—that "the service by motor vehicle . . . should be limited to service which is auxiliary to or supplemental of rail service." 77 M. C. C., at 622–623. The conclusion seems inescapable that the conditions imposed upon the permits to Pacific Motor,

---

[8] 49 Stat. 554, as amended, 49 U. S. C. § 310.

though undoubtedly "restrictions" in a general sense, were not limitations sufficient to hold Pacific Motor to a truly auxiliary and supplemental service.

Appellees urge that nonetheless there were "special circumstances" within the meaning of *American Trucking Associations.* Appellees point to various findings of fact by the Commission, such as the need of General Motors for a service of the type here involved, Pacific Motor's experience and qualifications, and the unlikelihood that a significant amount of traffic would be diverted from rail to motor transportation even if the permits were granted. The difficulty with appellees' argument is that the Commission did not find that considerations of this nature constituted "special circumstances" under the *American Trucking Associations* rule, but rather viewed them simply as supporting the basic determinations which it was required to make under § 209 (b) in order to issue a contract carrier permit to *any* applicant.[9]  And naturally we

---

[9] Section 209 (b) provides in pertinent part:

"Subject to section 310 of this title, a permit shall be issued to any qualified applicant therefor authorizing in whole or in part the operations covered by the application, if it appears from the applications or from any hearing held thereon, that the applicant is fit, willing, and able properly to perform the service of a contract carrier by motor vehicle, and to conform to the provisions of this chapter and the lawful requirements, rules, and regulations of the Commission thereunder, and that the proposed operation, to the extent authorized by the permit, will be consistent with the public interest and the national transportation policy declared in the Interstate Commerce Act; otherwise such application shall be denied. *In determining whether issuance of a permit will be consistent with the public interest and the national transportation policy declared in the Interstate Commerce Act, the Commission shall consider the number of shippers to be served by the applicant, the nature of the service proposed, the effect which granting the permit would have upon the services of the protesting carriers and the effect which denying the permit would have upon the applicant and/or its shipper*

should not substitute our judgment for the Commission's on a matter like this, for "[t]he grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." *Securities & Exchange Comm'n* v. *Chenery Corp.*, 318 U. S. 80, 87.

The Commission assigned but a single reason for not imposing the normal restrictions upon the Pacific Motor permits: to do so would compel Pacific Motor to conduct a common carrier service. Appellees support this decision upon the ground that the Commission is without authority under § 209 (b) to impose such character-destroying conditions upon a contract carrier permit.[10] We need not determine whether the Commission possesses the power to attach such limitations, or, in the alternative, to award a common carrier certificate, since we believe that, in any event, the Commission's reason is insufficient justification for its action. Assuming that the restrictions which would limit Pacific Motor's operations to an auxiliary and supplemental service would also be incompatible with a contract carrier operation, and that the Commission was consequently powerless to impose those restrictions, this alone does not, in our view, meet the "special circumstances" test. There is, for example, no finding that independent contract carriers were unable or

*and the changing character of that shipper's requirements. . . ."* (Emphasis added.)

The italicized portion was added by an amendment of August 22, 1957, 71 Stat. 411, well before the Commission's decision of September 9, 1958. Consequently, the Commission was required to apply the new standards. *Ziffrin, Inc.* v. *United States*, 318 U. S. 73, 78.

[10] Section 209 (b) provides in part that the Commission "shall attach to [the permit] . . . such reasonable terms, conditions, and limitations, *consistent with the character of the holder as a contract carrier* . . . as may be necessary to assure that the business is that of a contract carrier and within the scope of the permit, and to carry out . . . the requirements established by the Commission under section 304 (a) (2) and (6) of this title . . . ."

unwilling to perform the same type of service as Pacific Motor. In such a situation we do not believe that the policy of the Act allows the Commission to authorize service by Pacific Motor, limited only to points on the Southern Pacific line, simply because General Motors wants a contract carrier operation. If that desire of General Motors, in combination with the policy of the Act, disables a railroad subsidiary from obtaining the business, that is simply the result of the National Transportation Policy.[11] This consequence, we believe, does not meet the compelling public interest standard established by *American Trucking Associations*. A contrary conclusion would open the door to approval of over-the-road contract trucking by railroad subsidiaries to most, if not virtually all, major destinations, and hence would greatly attenuate the safeguards which have been painstakingly erected to prevent railroad domination of trucking. Appellees say that these safeguards are no longer needed, because independent trucking is no longer an "infant industry." This is an immaterial argument in this forum. We do not condemn the wisdom of the Commission's action. We simply say that the transportation legislation does, and that the pardoning power in this case belongs to Congress.

Thus the decision of the District Court must be reversed, because we conclude that the Commission fell into error of law. The question then arises whether there should be a remand which permits further proceedings. Appellants argue that there should not be, because the Commission, according to appellants, found that there

---

[11] "Such restrictions hamper railroad companies in the use of their physical facilities—stations, terminals, warehouses—their personnel and their capital in the development of their transportation enterprises to encompass all or as much of motor transportation as the roads may desire. The announced transportation policy of Congress did not permit such development." *United States* v. *Rock Island Motor Transit Co., supra,* at 443–444.

were no special circumstances aside from the alleged impossibility of imposing the usual restrictions upon a contract carrier. It is true that the Commission based the rail-point restriction upon "the absence of any showing of unusual conditions." 77 M. C. C., at 623. But we cannot be certain that the Commission thereby intended to say that there were no special circumstances within the meaning of the *American Trucking Associations* principle. As we have pointed out, the rail-point restriction, standing alone, is different in kind from limitations which impose an auxiliary and supplemental service. Consequently, we cannot be sure that the Commission believes the same sort of circumstances determine the applicability of both types of restrictions. Moreover, the Commission's discussion of this point is open to the interpretation that it was repeating some of its conclusions with respect to the § 209 (b) standards, *e. g.,* "the effect which granting the permit would have upon the services of the protesting carriers." See note 9, *supra*.[12] Under these circumstances, we would be warranted in precluding further proceedings only if, by an independent search of the record, we were able to conclude that, as a matter of law, there are no factors present which the Commission could have regarded as special circumstances. Although the findings of the Commission which are reflected in its opinion do not seem to us to comply with the *American Trucking Associations* standard, as the silence of the Commission seems to imply, we are unwilling in a complicated proceeding of this nature to deal with this problem *ab initio* or to say that the Commission could not have made additional findings on the basis of the evidence had it been aware that the ground its decision rested upon was insuffi-

---

[12] The rail-point limitation appears to have been designed primarily to prevent encroachment upon the business of competing rail carriers. Various railroads opposed the grant of authority before the Commission, but did not join in the federal court action.

cient. Consequently, under the particular circumstances of this case, we believe that it should be remanded to the Commission so that it can apply what we hold to be the applicable principles in such further proceedings as it may find to be consistent with this opinion.

The reversal and remand, however, will not include one aspect of the Commission's action—the grant of authority to provide a service to three nonrail points in Nevada—which is not governed by the rationale of our opinion. This small segment of the controversy has been submerged in the dispute over the much broader permit covering transportation to rail points in various States. It is obvious, of course, that "special circumstances" would have to be present to justify this Nevada award. Appellees maintain that there was such justification, and appellants have not established that it was lacking. Nor do we perceive any other reason to upset this award. Consequently, we affirm with respect to this particular permit.

There remains only the question of standing. Although the three-judge court concluded that the Commission had not exceeded its authority in this case, two members of the court also believed that "there was no showing of actual or anticipated direct injury such as would entitle [the appellants] to institute this action." 170 F. Supp., at 48. In support of this conclusion, appellees rely principally upon *Atchison, T. & S. F. R. Co.* v. *United States,* 130 F. Supp. 76, aff'd *per curiam,* 350 U. S. 892. That decision held that certain railroads had no standing to challenge a Commission order authorizing acquisition by one motor carrier of others. Since the lower court in *Atchison* stressed the fact that the Commission there had not created any additional motor carrier service, the decision clearly is not in point. In the instant case, not only has the Commission created new operating rights, but they are rights in which appellants have a stake. And

surely the statement by General Motors that it would not in any event give the business to any appellant cannot deprive appellants of standing. The interests of these independents cannot be placed in the hands of a shipper to do with as it sees fit through predictions as to whom its business will or will not go. The decision we believe to be controlling is not *Atchison,* but rather *Alton R. Co.* v. *United States,* 315 U. S. 15, where the Court confirmed the standing of a railroad to contest the award of a certificate to a competing trucker. We conclude, then, that appellants had standing to maintain their action to set aside the Commission's order under the "party in interest" criterion of § 205 (g) of the Interstate Commerce Act, 49 Stat. 550, 49 U. S. C. § 305 (g), and under the "person suffering legal wrong . . . or adversely affected or aggrieved" criterion of § 10 (a) of the Administrative Procedure Act, 60 Stat. 243, 5 U. S. C. § 1009 (a).

Our disposition of the case makes it unnecessary to consider the other issues raised by appellants.

We have no desire to hamper the Commission in the discharge of its heavy responsibilities, and we have always recognized that the Commission has been given a wide discretion by Congress. But that discretion has limits; our decision in favor of the Commission in *American Trucking Associations* established the limits relevant to this case; and we conclude that those limits have been transgressed. Of course, in remanding the case we do not intend to circumscribe the Commission in determining whether appropriate "special circumstances" do exist in this instance which would take the case out of the otherwise conventional standards.

The judgment of the District Court is reversed and the case is remanded to that court with directions to remand to the Commission for such further proceedings, not inconsistent with this opinion, as may be appropriate.

*It is so ordered.*