PENNSYLVANIA TRUCK LINES, INC., Maryland and West Virginia Company, Western Maryland Truck Lines, Inc., Reading Dispatch, Inc., and Black Diamond Transport Company, Plaintiffs,

v.

UNITED STATES of America and Interstate Commerce Commission, Defendants,

and

Carroll Transport, Inc., Chemical Leaman Tank Lines, Inc., James R. Hahn, E. Brooke Matlack, Inc., M. I. O'Boyle & Sons, Inc., and American Trucking Associations, Inc., Intervening Defendants.

Civ. A. No. 62-748.

United States District Court
W. D. Pennsylvania.

July 12, 1963.

Andrew C. Armstrong, Baltimore, Md., Lockwood W. Fogg, Jr., Philadelphia, Pa., Rene J. Gunning, Baltimore, Md., Richard D. Lalanne, New York City, Gilbert Nurick, Harrisburg, Pa., Carl Helmetag, Jr., Philadelphia, Pa., Donald A. Brinkworth, Pittsburgh, Pa., of counsel, for Pennsylvania Truck Lines, Inc., and others.

John H. D. Wigger, Dept. of Justice, Washington, D. C., Gustave Diamond, U. S. Atty., Pittsburgh, Pa., for the United States.

Leonard S. Goodman, Interstate Commerce Commission, Washington, D. C., for Interstate Commerce Commission.

Ewald E. Kundtz, Cleveland, Ohio, for Carroll Transport, Inc.

Leonard A. Jaskiewicz, Ronald N. Cobert, Washington, D. C., for Chemical Leaman Tank Lines, Inc.

Francis J. Ortman, Washington, D. C., for James R. Hahn.

David A. Sutherlund, Washington, D. C., for E. Brooke Matlack, Inc.

Clarence D. Todd, Washington, D. C., for M. I. O'Boyle & Sons, Inc.

Peter T. Beardsley, Richard R. Sigmon, Washington, D. C., for American Trucking Associations, Inc.

Henry M. Wick, Jr., Pittsburgh, Pa., of counsel, for intervening defendants.

Before STALEY, Circuit Judge, and MARSH and MILLER, District Judges.

JOHN L. MILLER, District Judge.

This is an action pursuant to 28 U.S.C. §§ 1336, 1398, 2284 and 2321 to 2323, Section 17(9) of the Interstate Commerce Act [49 U.S.C. § 17(9)] and Section 10 of the Administrative Procedure Act (5 U.S.C. § 1009) to set aside portions of two orders of the Interstate Commerce Commission, entered July 19, 1961 [H. C. Gabler, Inc., Extension—Cement from Maryland and Pennsylvania Counties, No. MC–27817 (Sub No. 35), 86 M.C.C. 447] and August 13, 1962

[Pennsylvania Truck Lines, Inc., Extension—Cement, No. MC–19201 (Sub No. 108), 91 M.C.C. 167], to the extent that they denied plaintiffs certificates to transport cement from areas in Pennsylvania's Lehigh District [1] to points in fourteen eastern states and the District of Columbia, and to remand to the Commission with directions for further proceedings consistent with the Court's opinion.

For many years, the railroads handled most of the huge volume of cement from the Lehigh District to consumers in the destination areas here involved. Generally, the cement producers made no effort to use motor service or to provide facilities at their plants for loading bulk cement for motor transportation. In 1958, eastern cement producers began installing expensive facilities to load bulk cement into tank vehicles for transport by motor carrier and now express a need for motor service.

Between December 1958 and March 1959, 43 applications seeking either common carrier certificates of public convenience and necessity or contract carrier permits authorizing the transportation of cement from the mills in the Lehigh District were filed. Some of the applicants had secured the support of the cement producers while others were backed by cement users. The producers, with one exception, supported only one independent motor carrier, while the cement users did not limit their support to a single carrier.

To meet the new developments, three of the railroads had each formed a new wholly owned and controlled trucking subsidiary; two other railroads had existing trucking subsidiaries. All five were among the 43 applicants for motor carrier authority. While the rail subsidiary applicants were supported by none of the producers, they had obtained the backing of some of the cement users.

After a consolidated hearing before a single examiner for all but one of the applicants, the examiner recommended that the producer-supported, contract carrier applicants (except Modern) be granted specific contract carrier authority and that the applications in all other respects be denied. The application of Coastal Tank Lines, Inc. was filed later and heard separately by a joint board, which recommended that it be granted to a limited extent.

Exceptions were filed and oral argument heard by the entire Commission, which found that there was a need for motor carrier service in the area, that two motor carriers should be authorized to serve each of the cement producers on a common carrier rather than a contract carrier basis, that the independent carriers were fit, willing and able to perform the needed services and that all the rail subsidiary applications, except one,[2] should be denied. Following further oral argument and reconsideration, the Commission affirmed its prior report with respect to the independent motor carriers, but concluded that "under existing law we may not grant functionally unrestricted motor carrier operating rights to these rail subsidiary applicants." This resulted in a reversal of its earlier decision regarding Black Diamond Transport Company, concluding that the railroad's economic plight did not justify placing its subsidiary in a position that would unduly restrain competition.

The plaintiffs appealed to this Court, asserting that they do not dispute the Commission's findings of fact but question its conclusion that it is without power to issue motor carrier certificates to trucking lines which are affiliated with and controlled by railroads. This action is limited to that issue.

The Commission is empowered, under Section 207(a) of the Interstate Com-

---

1. The Lehigh District includes cement mills within a forty (40) mile radius north of Allentown, Pennsylvania, and competitive plants in Maryland, West Virginia, the District of Columbia and York, Pennsylvania.

2. The application of Black Diamond Transport Company (subsidiary of Lehigh Valley Railroad) was granted because of the existence of special circumstances.

merce Act, [49 U.S.C. § 307(a)], to grant new service applications, "if it is found that the applicant is fit, willing, and able properly to perform the service proposed and to conform to the provisions of this chapter and the requirements, rules, and regulations of the Commission thereunder, and that the proposed service, to the extent to be authorized by the certificate, is or will be required by the present or future public convenience and necessity * * *." In this action, this Section must be considered along with the National Transportation Policy, preceding 49 U.S.C. § 1, which provides as follows:

"It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act * * * so administered as to recognize and preserve the inherent advantages of each; to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers; to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices; to cooperate with the several States and the duly authorized officials thereof; and to encourage fair wages and equitable working conditions—all to the end of developing, coordinating, and preserving a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense. All of the provisions of this Act * * * shall be administered and enforced with a view to carrying out the above declaration of policy."

The Commission has enforced the Interstate Commerce Act and the National Transportation Policy so as to preserve the inherent advantages of motor carrier service by preventing railroads from entering into open competition with independent motor carriers because it believes that a motor carrier with the financial backing of a railroad would be in such an advantageous position as to eventually restrict competition in the motor carrier field. The test which it applies in carrying out this policy is expressed in the following statement from Rock Island Motor Transit Company—Purchase—White Line, 40 M.C.C. 457, 474, quoted with approval by the Supreme Court in United States v. Rock Island Motor Transit Company, 340 U.S. 419, 71 S.Ct. 382, 95 L.Ed. 391 (1951):

"In other words, a railroad applicant for authority to operate as a common carrier by motor vehicle, though required to do no more than prove, as any other applicant, that its service is required by public convenience and necessity, has a special burden * * * by reason of the very circumstance that it is a railroad. Where it fails to show special circumstances negativing any disadvantage to the public from this fact, a grant of authority to supply motor service other than service auxiliary to and supplemental of train service is not justified."

Railroads are restricted in acquiring control of, or merging with, independent motor carriers by a proviso to Section 5(2) (b) of the Interstate Commerce Act, 49 U.S.C. § 5(2) (b), which reads as follows:

"Provided, That if a carrier by railroad subject to this chapter, or any person which is controlled by such a carrier, or affiliated therewith within the meaning of paragraph (6) of this section, is an applicant in the case of any such proposed transaction involving a motor carrier, the Commission shall not enter such an order unless it finds that the transaction proposed will be consistent with the public interest and will enable such carrier to use service by motor vehicle to

public advantage in its operations and will not unduly restrain competition."

Although this proviso refers to mergers and acquisitions rather than applications for certificates under Section 207, the Commission has applied the National Transportation Policy so as to read the proviso into Section 207; it has served as a guiding light in the interpretation of that section. United States v. Rock Island Motor Transit Company, supra.

Here the Commission found that the independent motor carriers were fit, willing and able to perform the services proposed. Its denial of the rail subsidiary applications was not based on the Commission's finding that the plaintiffs were not fit, willing and able to perform the proposed service, but because with the applications of the independent motor carriers the rail subsidiaries failed to establish that the present or future public necessity required their proposed operations.

The plaintiffs contend that fairness, equal application of the law and the sound administration of Congressional policies require that certificates be issued to the rail subsidiaries as well as the independent motor carriers to afford the railroads equal opportunity for fair and reasonable competition. The Commission found, however, that the plaintiffs had failed to establish that their proposed operations would be consistent with the public interest and the National Transportation Policy.

In the administration of the National Transportation Policy, the Commission has limited grants of motor carrier rights to a rail subsidiary to service that is auxiliary to and supplemental of rail service. The Commission had stated in Pennsylvania Truck Lines, Inc.—Control—Barker, 1 M.C.C. 101, 111 (1936) that it was "not convinced that the way to maintain for the future healthful competition between rail and truck service is to give the railroads free opportunity to go into the kind of service which is strictly competitive with, rather than auxiliary to, their rail operations."

Plaintiffs are not seeking a certificate for auxiliary and supplemental service but rather unrestricted authority to haul cement by motor carrier. It is the plaintiffs' contention that the Commission has the power under the Interstate Commerce Act to authorize railroads to engage in unrestricted motor carrier operations in an unoccupied field previously served exclusively by them in conventional railroad operations notwithstanding the fact that independent motor carriers also seek to enter the field. For this proposition, plaintiffs rely on footnote No. 4 in Rock Island Motor Transit Company—Purchase—White Line, 40 M.C.C. 457, 465 (1946).[3]

On those occasions when the Commission has granted unrestricted motor car-

---

3. "Cases in which future service was not restricted to rail points fall into three classes of natural exceptions to the Barker case principles, namely, (1) those in which the restrictions would be meaningless because all points on the acquired route were stations on the acquiring railroad, (2) those in which some of the points on the acquired routes involved, though located off-rail, were adjacent to the railroad and had no other adequate service, and (3) those in which the acquired motor carrier was in the nature of a branch or feeder line of the railroad reaching into territory not previously occupied or 'permissive' territory as it is called in one case. Cases of the latter type are the most important and comprise a distinct line beginning with Santa Fe Trails Stages, Inc.—Control—Central Arizona, 1 M.C.C. 225. In that case, which was decided while the Barker case was still pending, and is differentiated in the first supplemental report therein, a Santa Fe Railway bus—operating affiliate was permitted to acquire by purchase a motor line between Salt Lake City, Utah and Phoenix, Ariz. The acquired line was the only carrier in that part of the territory served lying between Flagstaff, Ariz., and Salt Lake City. Most of the points served in such territory were non-rail points. The acquisition promised improved bus service, which was needed. In the circumstances it was approved 'as equivalent to the building by the railroad of a branch or feeder line into a territory *not hitherto occupied* * * *.'"

rier authority to a rail subsidiary, it has done so only upon the showing of "special circumstances." The only "special circumstances" which have led the Commission to relax its restrictions on motor service by rail subsidiaries have been the unavailability of independent motor carrier service for the area involved.

In American Trucking Associations, Inc. v. United States, 355 U.S. 141, 78 S. Ct. 165, 2 L.Ed.2d 158 (1957), when the Commission did not limit a rail subsidiary to auxiliary or supplementary service, it had found that eleven points on the applicant's requested route would be totally without peddle service if the usual restrictions were applied. This was accompanied by the finding that at other places in the area independent motor carriers either failed to handle the traffic or gave service inferior to that proposed by the applicant. In American Trucking Associations, Inc. v. United States, 364 U.S. 1, 80 S.Ct. 1570, 4 L.Ed.2d 1527 (1960), the Supreme Court refused to sustain the Commission's grant to a rail subsidiary of authority for unrestricted service when the record did not contain a finding that independent carriers were unable or unwilling to perform the same type of service as that proposed by applicant.

In fact, in the case upon which plaintiffs rely for their so-called "unoccupied field exception" (Rock Island Motor Transit Company—Purchase—White Line, supra), the Commission restricted the applicant to auxiliary or supplemental service. Footnote No. 4 dealt only with exceptions to restricting service to rail points and not with exceptions to all auxiliary or supplemental service limitations. Since the phrase "auxiliary to or supplementary of" implies a limitation of function, i. e., type of trucking service, and not merely a geographical limitation, i. e., place where the service is performed, it is apparent that the Commission did not intend to open a new field of exceptions to its established rule. American

Trucking Associations, Inc. v. United States, 364 U.S. 1, 80 S.Ct. 1570, 4 L.Ed. 2d 1527 (1960).

The Commission, exercising the discretionary and supervisory power with which Congress has endowed it, has permitted rail affiliates to leave the line of the railroad only to serve communities without other motor carrier transportation. The Commission here found that the independent motor carrier applicants were fit, willing and able to furnish the proposed service so that the cement industry in the Lehigh District would not be without motor carrier transportation. The Commission has never granted unrestricted authority to a rail subsidiary merely because there were no independent motor carriers serving the territory prior to the railroad's application. We agree with the Commission's conclusion that under the existing law it may not grant functionally unrestricted motor carrier operating rights under such circumstances.

In reply to plaintiffs' contention that the application of Black Diamond Transport Company should be granted because its economic plight supplies the "special circumstances" for an exception, we need only reiterate that the only "special circumstances" recognized by the Commission are the unavailability of motor carrier transportation which would result from the denial of a rail subsidiary's application. Those "special circumstances" do not exist here.

While there may be some merit to the plaintiffs' contention that changed conditions in the transportation industry since the enactment of the Interstate Commerce Act require a reassessment of the National Transportation Policy with respect to railroads, this Court should not become the vehicle for reshaping the laws which Congress has written. The plaintiffs' appeal in that regard must be to Congress itself. The complaint must be dismissed.

An appropriate order will be entered.