TEAMSTERS JOINT COUNCIL 40 (J. C.), Local Union No. 249, affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Western Pennsylvania Motor Carriers Association, Inc. (WPMCA), a corporation, Plaintiffs,

v.

The UNITED STATES of America and the Interstate Commerce Commission, and Middle Atlantic Conference, Intervener, Defendants.

Civ. A. No. 64-470.

United States District Court
W. D. Pennsylvania.

Jan. 28, 1965.

Ben Paul Jubelirer, Stuart E. Savage, Edward M. Larkin, and Delisi, Wick & Vicono (John A. Vicono), Pittsburgh, Pa., for plaintiffs.

Robert W. Ginnane, Gen. Counsel, and Robert Burk, Atty., Interstate Commerce Commission; Wm. H. Orrick, Jr., Asst. Atty. Gen., and John H. D. Wigger, Atty., Dept. of Justice, Washington, D. C., for defendants.

Bryce Rea, Jr., and Rea, Cross & Knebel, for intervenor defendant Middle Atlantic Conference.

Before STALEY, Circuit Judge, GOURLEY, Chief District Judge, and WILLSON, District Judge.

WILLSON, District Judge.

Plaintiffs are Teamsters Joint Council No. 40 and Local Union No. 249, affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, and Western Pennsylvania Motor Carriers Association, Inc. They filed the instant complaint on May 14, 1964. The action was filed as a three judge court case under sections 1336, 1398, 2284, and 2321 through 2325, inclusive, of the Judicial Code, 28 U.S.C. §§ 1336, 1398, 2284, and 2321–2325, to enjoin, annul, and set aside the report and order of the Interstate Commerce Commission, Division 2, entered December 10, 1963, in Docket No. 34150, Middle Atlantic Conference v. A. A. A. Trucking Corp., 321 I.C.C. 406, in which the Commission found that the defendant motor carriers had furnished helpers, as well as drivers, to load or unload truckload shipments to or from the Pittsburgh area, without providing for such services in their tariffs or assessing charges therefor, in violation of sections 216 and 217 of the Interstate Commerce Act, and ordered such carriers to cease and desist their unlawful practices and to publish a remedial tariff rule, as specified by the Commission.

This statutory three judge court has been duly convened by an order of Chief Judge John Biggs, Jr. In due course the case came on for oral argument. Briefs were filed and counsel have been heard at argument, and the matter has been considered. In several respects this controversy is unique. In the first place there are no carriers or shippers objecting to the ICC action. The case before us is being pressed by the two labor unions. The Western Pennsylvania Motor Carriers Association, Inc., joined as a party plaintiff because it agreed with the unions to do so. This plaintiff is not a carrier, but an association formed by carriers. It does not contend that the ICC order is in anywise illegal or beyond the powers of the ICC to promulgate. Also the case is unique in that plaintiffs do not aver any lack of substantial evidence before the Commission but charge only that the Commission's order is too broad in that it impairs their labor contract. In their brief the union plaintiffs submit that they are not parties in interest or persons adversely affected or aggrieved in any order of the Commission requiring the carriers to charge consignors or consignees for services of a helper in loading or unloading truckload traffic. That issue, says plaintiffs, is solely between the Commission and the carriers. Plaintiffs say in their brief that:

"If the Commission, presumably acting under its statutory authority to require carriers to make 'just and reasonable' charges 'for any service rendered or to be rendered' (49 U. S.C. Sections 316(a) through (e)), the Union Plaintiffs have no valid standing in this Court to make complaint thereof.

"However," says the plaintiffs, "when the Commission extended its order to prohibit the carriers from furnishing helpers without the request of the consignor or consignee, in derogation of the collective bargaining agreement between the carriers and the Plaintiff Unions, the Commission exceeded it statutory authority in two respects: (1) unlawfully delegating its authority to consignors and consignees; and (2) the subject matter and the order of the Commission invades the regulatory territory Congress has preempted."

Defendants state that there are but two questions for this Court's determination:

1. Whether the plaintiffs lack standing to maintain this action.

2. Whether there was a rational basis for the Commission's conclusion that the furnishing of helper service without tariff authority or appropriate charges therefor, as more fully described in the Commission's report, was in violation of the provisions of sections 216 and 217 of the Interstate Commerce Act and whether its prescription of a rule that helpers would be furnished only upon request of the consignors or consignees accorded with the applicable law.

We have thus presented a situation in which there is no controversy as to the proceedings before the Commission. The Commission's record is before us. Plaintiffs complain that the Commission exceeded its statutory authority in the two respects just quoted, that is, unlawfully delegating its authority as to requirements of helpers to consignor and consignee, and, secondly, that the Commission's order invades the regulatory territory Congress has preempted. Of course, as to the latter, plaintiffs say that the Commission does not have power to determine labor disputes, even those involving common carriers.

■ An examination of the issues before this Court brings us back to the consideration of what are the powers of this three judge court with respect to the ICC order. Again there is no controversy as to the scope of judicial review in a case of this kind. Counsel have cited a recent decision of this Court, Worster Motor Lines, Inc. v. United States, 226 F.Supp. 603 (D.C.W.D.Pa. 1963). Also it is to be observed that the Courts are not to substitute their discretion for that of the Commission. And Mr. Justice White in Burlington Truck Lines v. United States, 371 U.S. 156, 169, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962), observed:

" '[A] simple but fundamental rule of administrative law * * * is * * * that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action * * *.' Ibid."

It is to be emphasized again that the plaintiffs do not quarrel with the proceedings before the Commission. That being so, the defendants in their brief have summarized those proceedings, and for convenience the Court recites such summary which is as follows:

"By complaint filed September 25, 1962, the Middle Atlantic Conference[1] alleged that named motor carriers participating in movements between points in middle Atlantic territory and the Pittsburgh area[2] were supplying additional personnel to load or unload truckload shipments capable of being handled by the drivers alone, without having

---

1. Middle Atlantic Conference is the duly-authorized tariff-publishing agent for approximately 1,300 motor common carriers operating within middle Atlantic territory, comprising the States of Delaware, Maryland, New Jersey, New York, Pennsylvania, Virginia, West Virginia and the District of Columbia, between that territory and New England territory, comprising the States of Maine, Massachusetts, Connecticut, New Hampshire, Rhode Island and Vermont, and between these two territories and Canada. See Middle Atlantic Conference—Agreement, 283 I.C.C. 683 (1951).

2. The points included within the area are Blairsville, Bruin, Confluence, Ellwood City, Emlenton, Farmington, Graysville, Grove City, Harmony, Jones Mills, Kittanning, Ligonier, Masontown, Mercer, New Bethlehem, New Castle, New Galilee, Pittsburgh, Portersville, Sagamore, Saltsburg, Sharon, Stone House, Uniontown and Waynesburg, Pa., and Chester, New Cumberland and Wheeling, W. Va.

made tariff provisions or assessing charges therefor, in violation of, *inter alia,* sections 216 and 217 of the Interstate Commerce Act.[3]

"The complaint was heard before an examiner of the Commission, at Washington, D. C., on February 13–15 and 25, 1963. Few of the defendant motor carriers appeared,[4] and only three testified in their behalf.[5] At the close of the hearings the Conference and most of the participating carriers filed briefs, and on June 12, 1963, the examiner served his report and recommended order. The examiner concluded that the practices of the defendant motor carriers violated the Act, stating, in part:

" 'The furnishing of helpers by defendants without charge or tariff authority violates sections 216 and 217 of the act, and constitutes a destructive competitive practice contrary to the prohibition against such in the national transportation policy. Section 216 is violated by the furnishing of one or more helpers without charge. This service is valuable and costs the defendants approximately $28 per day for each helper. By furnishing this costly service free of charge as described hereinbefore, the defendants give an undue and unreasonable preference and advantage to those persons who receive the service, to those localities where the service is performed, and to truckload traffic between the Pittsburgh area and origins or destinations in middle Atlantic territory; they subject persons, localities, and traffic not receiving such service to unjust discrimination, and to undue and unreasonable prejudice and disadvantage. Section 217 of the act is violated in that defendants have not filed tariffs authorizing helper service without charge, but do furnish such service notwithstanding.'

"Exceptions to the examiners's report and recommended order were filed by B & P Motor Express, Inc., Continental Transportation Lines, Inc., and The Transportation Corporation, and the Conference replied. On December 10, 1963, the Commission, Division 2, entered its report and order, the report and order assailed herein. The Commission agreed substantially with the findings and conclusions of the examiner and ordered the defendant motor carriers 'to abstain from furnishing helper service without charge to load or unload truckload traffic moving between points in the middle Atlantic territory and the so-called Pittsburgh-Wheeling area' and on such movements 'to maintain and apply, for the furnishing of helper service * * * the provisions and charges spec-

3. None of the plaintiffs herein was named as a defendant to the complaint, and none subsequently intervened or participated in the proceedings before the Commission.

4. Of the 782 defendants named in the complaint, 22 entered appearances: B & P Motor Express, Inc.; Bell Lines, Inc.; Continental Transportation Lines, Inc.; Dillie Motor Freight, Inc.; Easor Express, Inc.; Helm's Express, Inc.; Operator of Keystone Transfer Co., Inc.; Herriott Trucking Co., Inc.; Keystone-Lawrence Transfer & Storage Co.; Kramer-Consolidated Freight Lines, Inc.; Leonard Bros. Motor Express Service; Lightning Express, Inc.; The Maryland Transportation Company; The Middle Atlantic Transportation Co.; North Braddock Motor Lines Co.; Pennsylvania Transfer Co.; Pittsburgh-Wheeling Express, Inc.; The Royal Transportation Company; Standard Motor Freight, Inc.; The Transportation Corporation; Warner & Smith Motor Freight, Inc.; and Zeno Freightways, Inc.

5. The defendant motor carriers presented three witnesses, officials of B & P Motor Express, Inc.; Continental Transportation Lines, Inc.; and Leonard Bros. Motor Express Service.

ified in revised rule 90, as modified by this report.' 321 I.C.C. 412."

Findings of the Commission as to the history of Rule 90 and the reasons for the adoption of Revised Rule 90 are undisputed and are also summarized in the Government's brief. These facts are:

"The Unions, in their brief,[6] in no way dispute the facts of this case. In short, they are these:

"Motor carriers of general commodities [7] operating in the middle Atlantic territory long have provided that their drivers shall be available to load and unload truckload shipments. Rule 21, as published in 1944 in a Conference tariff declared that the freight rates governed thereby 'include the loading and unloading of freight onto and off carrier's vehicles when this service can be performed by one man.' The rule provided for the assessment of additional charges whenever, insofar as is pertinent to this case, more than one man was 'furnished for the benefit of and at the request of the consignor or consignee.' Id.

"Rule 21, however, was silent as to the assessment of additional charges if a helper was assigned to assist in the loading and unloading for the convenience of the motor carrier, and, accordingly, the practice developed for truckers to provide helpers to favored consignors or consignees, without charge, ostensibly in satisfaction of their own convenience.

"The widespread abuses under Rule 21 led to the adoption, effective June 12, 1961, of Rule 90 which reads, in part, as follows:

" 'Truckload rates in tariffs governed by this tariff will include the loading and unloading service of one man per vehicle whether he be driver, helper, or any other carrier employee. At each location where additional labor is used the charge therefor will be * * *

in addition to all other lawful freight charges. * * * Additional labor will not be furnished unless requested by consignor or consignee.'

The industry has found Rule 90 to be effective and enforceable. Most shippers have adapted readily to the change and reduced their demands upon carriers for extra help to perform loading and unloading. The carriers, in turn, have experienced lower helper-service costs and enjoyed increased net revenues.

"The employees released from performing loading and unloading tasks have been assigned other work by the carriers, and in Baltimore and Philadelphia they have won assurances of continued employment through attrition conditions, sometimes referred to as 'vanishing American' clauses, in their collective bargaining agreements negotiated since the adoption of Rule 90.

"Rule 90, however, was inapplicable on most truckload shipments between points in the middle Atlantic territory and the Pittsburgh area. In fact, most of the defendants to the proceeding before the Commission were Conference members which observed the requirements of Rule 90 on traffic elsewhere but which on traffic to and from the Pittsburgh area withdrew or 'flagged out' from adherence to the rule, for competitive reasons. The other defendants were parties to tariffs which, in one way or another, did not preclude the furnishing of helpers except upon the request of consignors or consignees."

Do the plaintiff unions have standing to bring the action in the District Court? Defendants answer this question in the negative and under it raise two defenses:

1. that the unions are not parties in interest under the Motor Carrier Act, 49 U.S.C.A. § 305(h) and

---

6. Plaintiff, Western Pennsylvania Motor Carriers Association, Inc., did not join in the brief of the other plaintiffs, herein referred to as the Unions, and filed none of its own. Its appeal, therefore, should be dismissed. Ryan v. Koch, 17 Wall. 19, 84 U.S. 19, 21 L.Ed. 611 (1872); The

Catherine, 7 Cranch 99, 11 U.S. 99, 3 L.Ed. 281 (1812).

7. Services required for loading and unloading articles of such size and weight that they cannot be handled by one man are not at issue in this case.

2. in any event have not exhausted their administrative remedies,

Plaintiffs say their right to sue is under 28 U.S.C. § 2323. It appears, however, that their right to sue, if any, must rest upon Section 205(h) of the Motor Carrier Act, 49 U.S.C.A. § 305(h) and that in turn refers to 49 U.S.C.A. § 17(9) which provides for judicial relief from decisions of the Commission. But suits are to be brought in accordance with existing law applicable in cases to enforce, enjoin, suspend, or set aside orders of the Commission. These sections of the statutes, say the defendants, are further circumscribed by the Administrative Procedure Act, 5 U.S.C.A. § 1009 (a), which requires that for a judicial review of an administrative action a person must have suffered a legal wrong or be adversely affected or aggrieved by such action within the meaning of the relevant statute. In this connection then the unions must concede that they have failed to exhaust their administrative remedies before the Commission because they did not request a rehearing after having actual notice of the decision one week prior to February 21, 1964, its effective date. But the defendants go further and state that in any event the unions are not parties in interest, nor are they aggrieved by the order. Both the statute and the Administrative Procedure Act, say defendants, bar plaintiffs from any relief in this Court. We agree. The matter before the Commission was a tariff or rate case. The parties before the Commission were motor carriers. The Commission acted on a complaint. Evidence was taken and the Commission found on that evidence that the practice of defendant carriers in providing helper service to favored shippers without charge amounted to undue preference and was contrary to the transportation policies of the country. Compare American Trucking Associations v. United States, 364 U.S. 1, 80 S.Ct. 1570, 4 L.Ed.2d 1527 (1961). The Commission found that § 217 of the Interstate Commerce Act was being violated by defendants because they furnish helper service for loading and unloading in the absence of charge or tariff authority. The reference to the Commission's findings at this point is for the purpose of indicating that it had before it only transportation problems. We hold that that being so the plaintiff unions had no stake as carriers in the transportation problem which the order of the Commission sought to correct. As indicated by the Court in Alton Railroad Co. v. United States, 315 U.S. 15, 62 S.Ct. 432, 86 L.Ed. 586 (1942), the unions are not competitors for any traffic in the territory. They are not transportation agencies in competition with the motor transport industry. And they are not, of course, members of any national transportation system which the Motor Carriers Act was designed to coordinate. Hence, they are not parties in interest.

Also, the order does not impair the validity of the collective bargaining agreements between the motor carrier employers and the plaintiff unions as the latter contend. Revised Rule 90 provides that, "Truckload rates in tariffs governed by this tariff will include the loading and unloading service of one man per vehicle whether he be driver, helper, or any other carrier employee." The rule does not prohibit a helper from doing the loading or unloading as long as the driver doesn't do so. The unions claim they have standing in the present action because the order of the ICC interferes with their right to bargain collectively on the use of helpers. The claimed interference is too remote and tenuous to give them standing to set aside the order of the Commission.

■ But in any event the record clearly shows that they took their chances in this Court rather than appearing before the Commission. The defendants argue that plaintiffs must have known of the ICC proceedings because of the necessarily wide publicity given to the trade by the Middle Atlantic complaint. This Court agrees that was likely so, but in any event counsel candidly admitted that one week's knowledge was had of the order prior to its effective date and no request for a rehearing was made

to the Commission. Under various decisions, notably Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638 (1938) and Macauley v. Waterman S. S. Corp., 327 U.S. 540, 66 S.Ct. 712, 90 L.Ed. 839 (1946), it must be held that the plaintiffs have not exhausted their administrative remedies and, therefore, have no standing in this Court.

But finally and most important, the Commission's action is based upon proceedings had by it pursuant to its authority and its order is based upon due consideration of substantial evidence. That is all that is required of the Commission, and this Court may not substitute its judgment for that of the Commission.

The evidence before the Commission revealed that originally some of the carriers provided helpers without charge allegedly for their own convenience. Customers began to demand such service as a condition to obtaining their traffic. However, the practice was not uniformly followed and some shippers and receivers received a greater service than others at the same charge. Eight officials or managers of motor carriers that were defendants in the Middle Atlantic ICC proceedings testified that to remain competitive the other carriers are forced to adopt the same practice. They testified that competition is so severe that at times as many as three helpers are furnished without charge or tariff authority. One defendant testified that helpers were not furnished for its convenience, and others stated that only on rare occasions were helpers used for their convenience. The testimony revealed that an attempt to dissuade the use of a helper often resulted in the loss of business and in some cases helpers were furnished at a loss. A service that costs approximately $28 per day for each helper was furnished free of charge to some persons and was denied to others. There is substantial evidence in the record before the Commission that the furnishing of this service free of charge constitutes a violation of section 216 of the act in that an undue and unreasonable preference and advantage is given to those persons who receive the service, to those localities where the service is performed, and to truckload traffic between the Pittsburgh area and places of origin or destination in the Middle Atlantic territory; persons, localities and traffic not receiving such service are subjected to unjust discrimination and to undue and unreasonable prejudice and disadvantage. There is also substantial evidence in the record to show a violation of section 217 of the act in that tariffs authorizing helper service have not been filed however, the service is furnished notwithstanding.

Plaintiffs in their brief cite three decisions in support of their position which require comment. One is Utah Citizens Rate Association v. United States of America et al., D.C., 192 F.Supp. 12, (1961). This was a three judge court case and was affirmed by the Supreme Court per curiam in 365 U.S. 649, 81 S. Ct. 834, 5 L.Ed.2d 857 (1961). An order of the ICC relating to an increase in freight rates came under attack. Utah Citizens Rate Association initially alone brought the action. Its capacity and standing to sue were questioned by the defendants. The Court granted leave to the Association to join as a party plaintiff Structural Steel and Forge Company, a substantial shipper in Utah. Defendants then asserted that even with this addition the plaintiffs had no standing to sue to set aside a general revenue order of the Commission. The Court agreed with defendants that Utah Citizens Rate Association had no legal right or interest that would be injuriously affected by the order. That part of the decision is against the plaintiff unions in the instant case. The Court, however, went on to hold that because Structural Steel and Forge Co. was a substantial shipper it had standing to sue under the party in interest criteria of 28 U.S.C.A. § 2323, and under the Administrative Procedure Act it being a person adversely affected or aggrieved. However, in the instant case, Western Pennsylvania,

Motor Carriers Association, Inc., is not a carrier or a shipper. Without question its members are carriers but none of the members are parties in this case. Needless to say the labor unions as plaintiffs fall under the same category as the Utah Citizens Rate Association and have no standing to sue.

As authority for their right to sue plaintiffs cite the case of the American Trucking Associations v. United States, 364 U.S. 1, 80 S.Ct. 1570, 4 L.Ed.2d 1527 (1961). This case dealt only with whether the Commission had authority to grant to a motor carrier subsidiary of a railroad permits to act as a contract carrier for a single shipper. Competing carriers protested. The Chief Justice for the Court held that appellants had standing as parties in interest and under the " 'person suffering legal wrong * * or adversely affected or aggrieved' criterion of § 10(a) of the Administrative Procedure Act * * *." The Court pointed out that the case involved competition among carriers and that carriers were before the Court.

On the merits generally plaintiffs cite the Burlington case where protesting carriers and the affected union sought judicial review in a three judge District Court which upheld the ICC order as within the scope of the Commission's statutory authority based on adequate findings and supported by substantial evidence. In order to correct what was alleged to be inadequacies in the service available, certain carriers had organized a new carrier called Short Line, and the Commission granted it a common carrier authority to transport commodities between certain interstate points. The question of standing of the union to join was not raised in the lower court nor in the Supreme Court. The lower court stated that the plaintiffs and intervenors were all common carriers except the labor union. The factual distinction between Burlington and the instant case is striking. In our case only the union presses the issue before this Court. Finally plaintiffs say that in Burlington the Supreme Court pointed to the duty of the Commission to avoid "trenching" on the field over which Congress has given jurisdiction to the National Labor Relations Board. But the case holds that the Commission is not to use a labor dispute as grounds for authorizing a new carrier when carriers in existence are able to give the service even though temporarily subject to hindrance by a labor dispute. The decision when carefully examined gives no support to plaintiffs in the instant case. The Commission was careful to point out that in other cities and areas effected by Revised Rule 90 there has been no disruption of service or even disputes as a result of the promulgation of the rule.

The other two cases cited by plaintiffs, American Newspaper Publishers Assn. v. National Labor Relations Board, 345 U.S. 100, 73 S.Ct. 552, 97 L.Ed. 852 (1953), and National Labor Relations Board v. Wooster Division of Borg-Warner Corp., 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958), relate to the duty of employers and employees to bargain collectively and in good faith. Neither case is concerned with the ICC or shippers or carriers in interstate commerce. Thus we conclude that the plaintiffs in this case have shown no ground upon which they are entitled to relief in this Court. Judgment will be entered for the defendants.